UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States Securities and Exchange
Commission,

                      Plaintiff,

v.                                        Case No. 11-CV-3656 (JNE/JJK)
                                        ORDER

Gary A. Collyard, Collyard Group, LLC,
Paul D. Crawford, Crawford Capital Corp.,
Ronald Musich, Joshua J. Singer, Michael
B. Spadino, Marketing Concepts, Inc., and
Christopher C. Weides,

                      Defendants.

## I.     Background

The SEC brought this action on December 21, 2011 alleging that at various points

between 2001 and 2010, the defendants violated Section 15(a) of the Securities Exchange Act of

1934, 15 U.S.C. § 78*o*(a), by acting as unregistered brokers in offering and selling the securities

of Bixby Energy Systems, Inc. ("Bixby").  Compl. ¶¶ 1-5, 38-40, Dkt. No. 1.  The SEC alleged

that defendants Gary A. Collyard ("Collyard") and Collyard Group, LLC ("Collyard Group")

further violated the securities laws by making material misrepresentations and omissions

regarding Bixby in connection with the offer and sale of Bixby securities.  Am. Compl. ¶¶ 40-44,

48-54, Dkt. No. 95.

Collyard Group, Paul D. Crawford ("Crawford"), and Crawford Capital Corp. ("CCC")

are the only defendants still contesting the merits of the allegations.  In April 2015, the Court

granted summary judgment against Collyard Group's owner, Collyard, on each of the counts

alleged against him.  Dkt. No. 149.  The other five defendants settled.

Three motions by the SEC are currently before the Court: (A) a motion for summary judgment against Crawford and CCC ("Crawford Motion") (*see* Dkt. Nos. 165 [SEC-CCC Br.], 173 [Opp.], 179 [Reply]), (B) a renewed motion for summary judgment against Collyard Group ("Collyard Group Motion") (*see* Dkt. No. 159 [SEC-CG Br.]), and (C) a motion for monetary relief against defendant Christopher C. Weides ("Weides Motion") (*see* Dkt. No. 154 [SEC-CW Br.]).

## II.      Analysis

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must view genuinely disputed facts in the light most favorable to the nonmovant, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable inferences from the evidence in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.      Crawford Motion

The SEC alleges that Crawford and his company CCC each violated Section 15(a) by acting as unregistered brokers in connection with the offer and sale of Bixby securities from approximately February 2004 through November 2006. Am. Compl. ¶¶ 3-5, 6, 35, 46-47. Section 15(a) makes it unlawful for a broker to "make use of the mails or any means or

instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered" with the SEC in accordance with Section 15(b).  15 U.S.C. § 78*o*(a).

Crawford and CCC deny "acting as a broker or a broker[-]dealer" and assert as defenses that they acted as a "finder," not a broker, and that the action is time-barred.  Answer ¶ 27, defenses ¶¶ 1-2, Dkt. No. 46.  They admit that they "received fees of $240,000 February 2004 to November 2006."  *Id.* ¶ 33.[1]

All of the following facts are uncontested.[2]  Crawford made an initial investment of around $20,000 in Bixby.  Opp. 3.  For some period of time, pursuant to an agreement with co-defendant Weides, who had an agreement with Bixby, Crawford began referring other investors to Bixby, and Weides paid him a 3% commission on each referral's investment.  Opp. 3; SEC-CCC Br. Ex. 2, Crawford Dep. 71:7-17, 73:20-23.  Crawford then entered into a consulting agreement directly with Bixby pursuant to which Bixby paid a 10% fee on any investments made by persons whom Crawford "found" and referred to Bixby.  Opp. 2-3.  He was not a Bixby employee.  Opp. 2; SEC-CCC Br. Ex. 2, Crawford Dep. 22:4-15.  Crawford and CCC received $240,000 in fees from Bixby, representing 10% of the investments that his "clients," as he called them, made in Bixby.  Opp. at 3; SEC-CCC Br. Ex. 2, Crawford Dep. 25:15-27:14, 51:21-53:5;

---

[1] Crawford answered the original complaint, but not the amended complaint.  As the SEC acknowledged, the amended complaint only added allegations against Collyard and Collyard Group and did not change any allegations against Crawford or CCC.  The SEC did not seek any consequences for Crawford or CCC's failure to answer the amended complaint.

[2] The SEC did not authenticate the documents it submitted as exhibits, but no defendant challenges their authenticity.  The Crawford defendants, in fact, rely on some of the exhibits.  Therefore, to the extent that the exhibits submitted by the SEC support the facts it contends they support, and to the extent that no party cites to conflicting facts in the record, the Court considers those facts to be undisputed for purposes of these motions.  Fed. R. Civ. P. 56(e)(2).

SEC-CCC Br. Ex. 12.  Bixby paid these fees in the amounts of $8,000 to Crawford and $232,000 to CCC.  SEC-CCC Br. Ex. 12; *id.* Ex. 2, Crawford Dep. 49:23-50:4.

Crawford's efforts to connect investors with Bixby were significant and multi-faceted. He invited potential investors to Bixby presentations.  Opp. 2; SEC-CCC Br. Ex. 2, Crawford Dep. 30:11-17.  He also emailed CCC clients regularly, unsolicited, to suggest investments in Bixby or other companies—typically in glowing terms predicting, for example, "blockbuster" sales in "a very short period of time."  SEC-CCC Br. Ex. 13, Bohn Dep. 27:14-28:10, 33:22-34:17, 35:23-37:8; *id.* Ex. 14, Haluptzok Dep. 42:11-44:25.  Some of his other emails to CCC clients provided follow-up information on their investments and urged them to exercise warrants to purchase more stock.  *Id.* Ex. 13, Bohn Dep. 29:20-30:1, 31:22-32:14; *id.* Ex. 14, Haluptzok Dep. 18:18-21:10, 22:14-23:12, 25:14-26:6.  He also provided advice to CCC clients about how to take advantage of tax credits.  *Id.* Ex. 13, Bohn Dep. 46:10-47:12; *id.* Ex. 14, Haluptzok Dep. 45:12-22.  In addition to these solicitations, Crawford asked Bixby to send private placement memoranda to the potential investors he had identified.  Opp. 3.  Sometimes the investors purchased their shares directly from Bixby, but sometimes they gave Crawford their checks made out to Bixby, and Crawford passed the checks to Bixby to finalize the investments.  *Id.* at 3; SEC-CCC Br. Ex. 2, Crawford Dep. 43:9-14, 49:3-13; *id.* Ex. 13, Bohn Dep. 23:7-16; *id.* Ex. 14, Haluptzok Dep. 14:14-23; *id.* Ex. 18.  Crawford also, on at least one occasion, assisted a client in completing the subscription agreement for his investment and forwarded the agreement to Bixby.  *Id.* Ex. 13, Bohn Dep. 20:13-21:13.  He also represented to CCC clients that he could negotiate prices of Bixby stock.  *E.g.*, *id.* Ex. 14, Haluptzok Dep. 34:11-35:10; Ex. 24.[3]  And he,

---

[3] In his opposition, Crawford asserts, without citing to any evidence, that he did not negotiate price between Bixby and the investors.  Opp. 11.  Mere assertions do not create a genuine dispute; Crawford was required to cite "to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1).

at least once, informed CCC clients that the firm could arrange a Bixby-related credit line deal for them on "extraordinary" terms. *Id.* Ex. 13, Bohn Dep. 25:19-26:17.

Although Crawford was registered as a broker earlier in his career, his license was suspended in 1996 on the grounds that he had sold unregistered securities, and he never reinstated it. SEC-CCC Br. Ex. 2, Crawford Dep. 10:15-12:3; *see also* Answer ¶ 12. CCC was also not registered pursuant to Section 15(b) during the relevant time period. SEC-CCC Br. Ex. 2, Crawford Dep. 16:22-24.

i. *Whether Crawford Acted as an Unregistered Broker*

The Exchange Act defines "broker" as "any person *engaged in the business* of *effecting transactions* in securities for the account of others," with certain exceptions not relevant here. 15 U.S.C. § 78c(a)(4)(A) (emphasis added). The cases focus on what it means to be "engaged in the business" and to "effect[] transactions." It is uncontested that the Bixby stock purchased by Crawford-referred investors was a security. The parties differ, however, on whether Crawford was acting as a broker within the meaning of Sections 3 and 15(a) or as a "finder" not subject to Section 15(b)'s registration requirement.

There is a dearth of binding case law on the question of what it means to act as a broker. The parties cite only non-binding cases, mostly from district courts outside of the Eighth Circuit, and scholarly articles. The Court has found only one decision in this circuit addressing the question, and its discussion was brief. *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990). The *Ridenour* court affirmed the holding that the defendant was a broker-dealer because of his "level of activity"—engaging in "a series of transactions" involving securities over two years—and the fact that he "attempted to obtain and keep a regular clientele" for his deals, which he negotiated. *Id.*

One of the more commonly cited cases on this question held that whether a person was acting as a broker is informed by multiple factors: whether the person "1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors." *SEC v. Hansen*, No. 83 Civ. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984). In that case, Hansen was not an employee; he was a contractor paid by commission. *Id.* at *11. He had previously sold securities on behalf of another issuer and had applied for broker-dealer registration but was denied. *Id.* He "was an active and aggressive finder of investors," seeking them out through advertisements, hosting seminars, and frequently sending potential investors letters "which extolled the virtues" of the issuer and the investment programs it was offering. *Id.* at *2, *11. He also "frequently gave those investors extensive advice with regard to the merits of the [investment] programs," telling them, for example, that "they would receive large returns on any capital invested" and providing estimates of potential returns. *Id.* at *3, *11. Even though the court did not find that he had engaged in negotiations with the issuer on behalf of potential investors, the court found that these facts, in addition to the fact that he "regularly participated at key points in the chain of distribution of the [] securities," *id.* at *10, added up to a conclusion that Hansen acted as a broker, *id.* at *11.

Many courts have adopted some or all of the so-called *Hansen* factors. *E.g.*, *SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 262 (N.D.N.Y. 2014) (considering the *Hansen* factors regarding solicitation, negotiations, and transaction-based compensation); *Landegger v. Cohen*, No. 11-cv-01760-WJM-CBS, 2013 WL 5444052, at *5 (D. Colo. Sept. 30, 2013) (citing *Hansen*); *SEC v. Art Intellect, Inc.*, No. 2:11-CV-357, 2013 WL 840048, at *20 (D. Utah Mar. 6,

2013) (citing the following *Hansen* factors: "solicitation of investors to purchase securities, involvement in negotiations between the issuer and the investor, and receipt of transaction-related compensation"); *SEC v. Offill*, No. 3:07-CV-1643-D, 2012 WL 246061, at *7 (N.D. Tex. Jan. 26, 2012) (same); *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011) (citing all *Hansen* factors); *Found. Ventures, LLC v. F2G, Ltd*, No. 08 Civ. 10066 (PKL), 2010 WL 3187294, at *5 (S.D.N.Y. Aug. 11, 2010) (citing *Hansen*); *Salamon v. Teleplus Enters., Inc.*, No. Civ. 05-2058 (WHW), 2008 WL 2277094, at *8 (D.N.J. June 2, 2008) (quoting *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (quoting *Hansen*)); *cf.* John L. Orcutt, *Improving the Efficiency of the Angel Finance Market*, 37 Ariz. St. L.J. 861, 906, 908, 914-16 (2005) (explaining that making investment recommendations, participating in negotiations, receiving transaction-based compensation, actively locating potential investors, having previously sold securities, and assisting others in settling securities transactions are all indications of broker activity); John Polanin, Jr., *The "Finder's" Exception from Federal Broker-Dealer Registration*, 40 Cath. U. L. Rev. 787, 827 (1991) ("Conducting sales efforts, making recommendations about securities, participating in negotiations between buyers and sellers of securities, holding investors' funds or securities, and receiving transaction-based compensation are hallmarks of the broker-dealer. Engaging in any one of these activities may be sufficient to require registration if carried on with any degree of regularity.").

For example, in *Martino*, citing the *Hansen* factors, the district court held at summary judgment that the defendants "plainly acted as brokers" when they regularly and affirmatively solicited investors, acted as "middlemen" between the investors and issuers, were not employees of the issuers, received transaction-based commissions, "participated in the sale of stock of

numerous issuers over a period of several years," and assisted in negotiating the stock sales at issue.  255 F. Supp. 2d at 283-84.

Other courts have considered slightly different or additional factors, including "handling customer funds and securities, participating in the order-taking or order-routing process, and extending or arranging for the extension of credit in connection with a securities transaction." *Art Intellect*, 2013 WL 840048, at *20 (citing, e.g., *Mass. Fin. Servs. Inc. v. Sec. Investor Prot. Corp.*, 411 F. Supp. 411, 415 (D. Mass. 1976)).  Other factors may include "analyzing the financial needs of an issuer," "recommending or designing financing methods," discussing "details of securities transactions," and recommending an investment.  *Kramer*, 778 F. Supp. 2d at 1334 (quoting *Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, 2006 WL 2620985, *6 (D. Neb. 2006)).

The Sixth Circuit affirmed the use of the following factors, mostly adopted from *Hansen*: "regular participation in securities transactions, employment with the issuer of the securities, payment by commission as opposed to salary, history of selling the securities of other issuers, involvement in advice to investors[,] and active recruitment of investors."  *SEC v. George*, 426 F.3d 786, 797 (6th Cir. 2005).  In *George*, a defendant argued that he was not employed by the issuer (which other courts typically construe as supporting a finding that the defendant is a broker) and that he did not receive compensation because he lost money through his own investment.  *Id.*  The Sixth Circuit found that even if it accepted those arguments, the SEC's evidence that he "was regularly involved in communications with and recruitment of investors for the purchase of securities" would suffice to support the entry of summary judgment against him.  *Id.* (citing *SEC v. Kenton Capital, Ltd.*, 69 F.Supp.2d 1, 13 (D.D.C. 1998)).

*Hansen* also found that the alleged broker must have had "a certain regularity of participation in securities transactions at key points in the chain of distribution." 1984 WL 2413, at *10 (internal citation omitted); *see also Found. Ventures*, 2010 WL 3187294, at *5; *Salamon*, 2008 WL 2277094, at *8 (quoting *Martino*, 255 F.Supp.2d at 283) (quoting *Hansen*). The "regularity of participation" has been measured by "such factors as the dollar amount of securities sold" and "the extent to which advertisement and investor solicitation were used." *Kenton*, 69 F. Supp. 2d at 13. This analysis appears to bear on whether the defendant has "engaged in the business." Some courts consider the regularity of a defendant's participation to be a primary signifier. *Kramer*, 778 F. Supp. 2d at 1334; *Landegger*, 2013 WL 5444052, at *5 (citing *Kenton*, 69 F. Supp. 2d at 12). The Eighth Circuit's attention to the *Ridenour* defendant's "level of activity" is particularly instructive. 913 F.2d at 517.

Others courts place great weight on whether the defendant received commissions, considering the receipt of transaction-based compensation to be "one of the hallmarks of broker status." *Kramer*, 778 F. Supp. 2d at 1334 (quoting *Cornhusker*, 2006 WL 2620985, at *6); *Landegger*, 2013 WL 5444052, at *5. The "underlying concern [is] that such compensation represents a potential incentive for abusive sales practices that registration is intended to regulate and prevent." *Landegger*, 2013 WL 5444052, at *5; *see also* Orcutt, *supra*, at 908.

Most courts do not require the SEC to establish each of the various cited factors in order to prevail on summary judgment, but rather determine that some combination of factors establishes that the defendant acted as a broker. *See, e.g.*, *George*, 426 F.3d at 797 (discussed above); *StratoComm Corp.*, 2 F. Supp. 3d at 263 (granting summary judgment against a defendant who solicited investors, "relayed terms of the transactions and handled related paperwork," and received transaction-based compensation); *Art Intellect*, 2013 WL 840048, at

*21 (granting summary judgment against defendants on Section 15(a)(1) claims based on the defendants' active solicitations of investors); *Kenton*, 69 F. Supp. 2d at 12-13 (awarding summary judgment to the SEC based on the defendants' active solicitation of investors and the volume of their business—receiving pledges to invest from over forty individuals, twelve of whom actually invested); *Hansen*, 1984 WL 2413, at *10-11 (discussed above). *But see SEC v. U.S. Pension Trust Corp.*, 2009 WL 2365702, at *9 (S.D. Fla. July 30, 2009).

Considering the factors discussed above, including the Eighth Circuit's emphasis on the defendant's "level of activity" and maintenance of a client base in *Ridenour*, the Court easily concludes based on this record that Crawford was acting as a broker. The undisputed facts establish that Crawford was not a Bixby employee and that he and CCC received transaction-based commissions summing up to at least $240,000, signifying the large volumes that his clients invested in Bixby. Crawford maintained a list of investor clients, and he actively solicited these clients to invest or reinvest in Bixby and other issuers. In doing so, he frequently offered optimistic assessments of the issuer and potential returns on an investment, and on occasion even provided tax advice and offered to arrange for a credit line for clients. He also interposed himself as an intermediary between the clients and Bixby at key points of the transaction, including at times handling client funds. Further, he at times assisted clients in filling out the Bixby subscription agreements, accepted the clients' investment checks and sent them to Bixby, and sent regular informational updates about Bixby along with solicitations for the clients to invest further in Bixby stock. In addition, a CCC client testified that Crawford offered to negotiate special prices for his clients to purchase more stock through warrant exercises. Viewed as a whole and in the light most favorable to him, the undisputed facts could only support a

finding by a reasonable factfinder that Crawford violated Section 15(a) by acting as a broker in connection with the offer and sale of Bixby securities.

The SEC has also met its burden with regard to CCC.  Crawford was CCC's sole owner and its only employee during the relevant time.  *See* Opp. 1 (citing SEC-CCC Br. Ex. 2, Crawford Dep. 17).  Correspondence submitted by the SEC in support of its motion shows that Crawford communicated with investors and with Bixby in his capacity as CCC's owner and/or employee.  *E.g.*, SEC-CCC Br. Exs. 9, 10, 16.  In addition, Bixby paid nearly all of the undisputed $240,000 in commission payments to CCC, with only $8,000 going to Crawford personally.  Crawford's broker activity can thus be imputed to CCC.  *Vohs v. Miller*, 323 F. Supp. 2d 965, 972 (D. Minn. 2004); *Martino*, 255 F. Supp. 2d at 283; *see also Kenton*, 69 F. Supp. 2d at 5, 13 (finding both a company and its president liable where the president made all of the company's decisions).

Crawford's primary substantive defense relies entirely on *SEC v. Kramer*, 778 F. Supp. 2d 1320 (M.D. Fla. 2011), and a few scholarly articles to establish what he construes as a "finder's exception" to Section 15(a) liability.  Crawford is correct that courts and the SEC have at times declined to find Section 15(a) liability where a defendant acted as a finder by "[m]erely bringing together the parties to transactions."  *Id.* at 1336.  But that characterization does not apply to the facts in this case.  Crawford and CCC were much more actively involved in soliciting the client base, recommending that clients invest (and reinvest) in Bixby and other issuers, and assisting with the logistics of the investment, including handling clients' checks.  In *Kramer*, unlike here, the court found that the defendant never received transaction-based compensation from the issuer directly as a result of referring investors to the company, and also credited testimony that the defendant recommended the investment only to "a small but close

group" of friends and intimates, not a client base.  778 F. Supp. 2d at 1339-40.  In contrast, Crawford and CCC admittedly targeted clients and received commissions based on those clients' investments in Bixby.

Crawford also insists that because he believed he was a finder, he was thus not subject to the registration requirement, implying that scienter is an element of a Section 15(a) claim, but he offers no authority for this suggestion.  The statute makes no reference to scienter.  15 U.S.C. § 78*o*(a).  And courts have held that scienter is not a requirement for liability.  *E.g.*, *Art Intellect*, 2013 WL 840048, at *20; *Offill*, 2012 WL 246061, at *6; *Martino*, 255 F. Supp. 2d at 283.  But even if he did not believe he was violating the law, Crawford was formerly a registered broker and must be charged with familiarity with the regulatory scheme.  He was at least reckless in failing to renew his license when he continued in the business of soliciting investors for early-stage companies, accepting a commission on those investments, and engaging in other activities typical of brokers.  In fact, the SEC points to evidence that Crawford was aware of "securities issues" related to his agreement with Bixby, which supports an inference that Crawford knew he was violating the securities laws.  SEC-CCC Br. Ex. 2, Crawford Dep. 59:10-60:13; *id.* Ex. 8.  Crawford cites nothing in the record to create a genuine dispute over this evidence.

The SEC has met its burden of showing that it is entitled to judgment as a matter of law on the question of whether Crawford and CCC acted as unregistered brokers.  Therefore, summary judgment is merited against both defendants.

       ii.      *Statute of Limitations Defense*

Crawford also argues that the SEC's claims against him are barred by the five-year statute of limitations imposed by 28 U.S.C. § 2462.  That statute provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise,

shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ."  28 U.S.C. § 2462.

Section 2462 plainly bars any request for civil penalties based on alleged violations that occurred more than five years before a lawsuit was filed.  The SEC does not contest this legal conclusion, but asserts that evidence in the record shows that Crawford and CCC continued to act as unregistered brokers by actively soliciting Bixby investments and the exercise of warrants as late as 2011 and 2012.  Reply 10-11.  The Amended Complaint, however, does not allege continuing violations by Crawford or CCC into 2012.  Rather, although it generally alleges that Bixby sold securities from 2001 to 2010, as to Crawford and CCC specifically, it alleges only that these two defendants sold Bixby securities "[f]rom approximately February 2004 to November 2006 . . . ."  Am. Compl. ¶ 35.  The SEC filed its complaint in December 2011.  Therefore, the SEC's request for civil penalties is barred by Section 2462 because it is based on violations alleged to have occurred up until November 2006.  *See Gabelli v. SEC*, 133 S. Ct. 1216, 1220, 1224 (2013).

The Court does not agree, however, with Crawford's contention that the entire complaint, including the SEC's requests for disgorgement and a permanent injunction, is time-barred as against him.  Crawford, noting that the Supreme Court expressly declined to reach this question in *Gabelli*, 133 S. Ct. at 1220 n.1, asks this Court to follow a Southern District of Florida case to determine post-*Gabelli* that Section 2462 extends to claims for disgorgement and injunctive relief.  *SEC v. Graham*, 21 F. Supp. 3d 1300, 1309-10 (S.D. Fla. 2014).  But that decision is something of an outlier.  *See SEC v. Quinlan*, 373 Fed. Appx. 581, 589 (6th Cir. 2010) (affirming the district court's holding that the injunction sought was remedial rather than punitive and therefore "not a 'penalty' subject to § 2462's five-year statute of limitations"); *Sierra Club v.*

*Otter Tail Power Co.*, 615 F.3d 1008, 1018 (8th Cir. 2010) ("28 U.S.C. § 2462 by its terms . . .

does not bar equitable remedies."); *Riordan v. SEC*, 627 F.3d 1230, 1234-35 (D.C. Cir. 2010)

(holding that Section 2462 did not prevent the SEC from seeking disgorgement of profits related

to alleged violations outside the five-year statute of limitations and also did not bar a cease-and-

desist order); *United States v. Mlaskoch*, Civ. No. 10-2669 (JRT/LIB), 2014 WL 1281523, at

*12-13 (D. Minn. Mar. 31, 2014) (holding that Section 2462 did not bar the government's claims

for injunctive or remedial relief); *SEC v. Geswein*, 2 F. Supp. 3d 1074, 1084 (N.D. Ohio 2014)

(refusing to reconsider its holding that Section 2462 did not apply to the SEC's claims for

injunctive relief and disgorgement); *SEC v. Kelly*, 663 F. Supp. 2d 276, 287 (S.D.N.Y. 2009)

("[S]ection 2462's statute of limitations applies to the SEC's request for civil penalties but not to

its request for permanent injunctive relief, disgorgement, or an officer and director bar."); *see

also SEC v. Rind*, 991 F.2d 1486, 1491-92 (9th Cir. 1993) (holding that no statute of limitations

limited the government's requests for disgorgement and an injunction).

Crawford's invitation to read into Section 2462 a limitation on requests for equitable

relief as well as "any civil fine, penalty, or forfeiture" runs counter to "the well-established rule

that 'an action on behalf of the United States in its governmental capacity . . . is subject to no

time limitation, in the absence of congressional enactment clearly imposing it." *Mlaskoch*, 2014

WL 1281523, at *12 (quoting *United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997)). It

also conflicts with the canon of construction that statutes of limitation that arguably could apply

to the government "must receive a strict construction in favor of the Government." *Id.* (quoting

*United States v. Findett Corp.*, 220 F.3d 842, 848 (8th Cir. 2000). Such an interpretation would

also fail to recognize that civil penalties are "a different kind of relief" than relief that, for

example, seeks to "restore the status quo." *Gabelli*, 133 S. Ct. at 1223.

Many courts state categorically that Section 2462 does not bar equitable relief, without engaging in a fact-specific analysis to determine whether the equitable relief sought in each case is punitive or remedial in nature, but many other courts undertake the fact-specific analysis. *Quinlan*, 373 Fed. Appx. at 587 (collecting cases for both the categorical and fact-specific approaches); *SEC v. Wyly*, 950 F. Supp. 2d 547, 558 (S.D.N.Y. 2013) (same).  For example, even in *Graham*, the case Crawford relies on, the district court based its holding at least in part on its factual finding that the SEC's requests were punitive, including the request for injunctive relief "where, as here, no evidence (or allegations) of any continuing harm or wrongdoing has been presented."  21 F. Supp. 3d at 1310.

In this case, the record amply supports the conclusion under either a categorical or fact-specific analysis that the SEC's requests for disgorgement, prejudgment interest, and injunctive relief are not barred by Section 2462.  Unlike in *Graham*, the SEC cites evidence showing that Crawford and CCC are reasonably likely to violate Section 15(a) again unless enjoined.  *See infra* Section II(A)(iii).  The SEC's evidence and argument demonstrates that it seeks the injunction not to penalize, but rather to protect the investing public from future Section 15(a) violations by these defendants.  *See Quinlan*, 373 Fed. Appx. at 588; *see also SEC v. Quan*, No. CIV. 11-723 ADM/JSM, 2014 WL 4670923, at *11 (D. Minn. Sept. 19, 2014), *amended*, 2014 WL 6982914 (D. Minn. Dec. 10, 2014) ("The purpose of the injunctive relief is to protect the investing public and to enforce the securities laws.").  As for the request for disgorgement, this type of relief is equitable, not punitive—it "merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud."  *SEC v. Brown*, 658 F.3d 858, 860-61 (8th Cir. 2011) (quoting *Kenton*, 69 F.Supp.2d at 17); *see also SEC v. O'Hagan*, 901 F. Supp. 1461, 1472 (D. Minn.

1995) ("Disgorgement has long been held to be within the district court's equitable powers under the Exchange Act.").  An award of prejudgment interest is also an equitable remedy that seeks to prevent unjust enrichment.  *SEC v. Teo*, 746 F.3d 90, 109 (3d Cir. 2014); *O'Hagan*, 901 F. Supp. at 1473.

The Court is satisfied that the SEC's requests for injunctive relief, disgorgement, and prejudgment interest are not a "civil fine, penalty, or forfeiture" limited by Section 2462.  *E.g.*, *Quinlan*, 373 Fed. Appx. at 589; *Mlaskoch*, 2014 WL 1281523, at \*12-13.

### iii.    Remedies

The Court now turns to the SEC's requests for a permanent injunction against Crawford and CCC and an order for disgorgement and prejudgment interest.

A "permanent injunction requires the SEC to prove that the defendant violated the law and that there is a reasonable likelihood of future violations."  *SEC v. Gruenberg*, 989 F.2d 977, 978 (8th Cir. 1993).  The undisputed facts show that over a period of years, Crawford and CCC acted as unregistered brokers, garnering at least $240,000 in commissions from over $2 million of investments by their clients.  Their pattern of behavior was not an isolated incident, but rather was integral to their entire business model, which persuades the Court that the behavior is reasonably likely to recur.  *SEC v. Capital Sols. Monthly Income Fund, LP*, 28 F. Supp. 3d 887, 893 (D. Minn. 2014); *O'Hagan*, 901 F. Supp. at 1473.  The SEC also cites undisputed deposition testimony showing that Crawford and CCC continued to act as brokers, soliciting clients to invest or re-invest in Bixby as late as 2011 and 2012, even after the SEC filed its complaint. SEC-CCC Br. Ex. 14, Haluptzok Dep. 26:13-27:14, 34:2-22; *id.* Ex. 17, Gentry Dep. 31:8-33:16. Crawford also was previously disciplined for violations of the rules governing broker-dealers with a sanction suspending his broker-dealer license, and it is undisputed that he chose not to

16

renew his license after the suspension was lifted, even though he was familiar with the registration requirement.  These facts further support the conclusion that Crawford may continue to flout the securities laws in his continued role as CCC's owner.  *See Gruenberg*, 989 F.2d at 978 ("evidence of past violations provides basis for inference that future violations may occur").  Crawford and CCC also continue to contest liability, insisting that their actions fall within a "finder's exception" to Section 15(b) requirements and that they should be free to continue their business, which supports an inference that they may continue to operate as purported "finders" unless enjoined.  *See Quinlan*, 373 Fed. Appx. at 588; *Capital Sols.*, 28 F. Supp. 3d at 895.  In sum, it appears reasonably likely that Crawford and CCC will violate the securities laws in the future, and a permanent injunction is therefore appropriate and necessary to prevent the likelihood that they will otherwise violate Section 15(a) again.  *Gruenberg*, 989 F.2d at 978.

The SEC also seeks disgorgement of the $240,000 that Crawford and CCC received as commissions for their clients' investments in Bixby.  This total amount is undisputed, as is the source and the fact that these payments were commissions.  Opp. 2-3; Answer ¶ 33.  As explained above, although Crawford and CCC earned these commissions in 2004-2006, Section 2462 does not prevent the government from seeking disgorgement of these amounts.  Disgorgement prevents unjust enrichment by requiring the return of wrongfully acquired profits.  *Brown*, 658 F.3d at 860-61.  Therefore, disgorgement of the $240,000 is appropriate.[4]

Prejudgment interest also prevents a defendant from profiting from securities violations.  *O'Hagan*, 901 F. Supp. at 1473.  "It is within the District Court's equitable discretion to decide

---

[4] The SEC did not specify how it seeks to have the Court allocate the total disgorgement amount between the two defendants or whether it seeks an imposition of joint and several liability; this question also may affect the imposition of prejudgment interest.  Without further clarification on these points, the Court will not impose entry of judgment on the SEC's motion for disgorgement and prejudgment interest as against Crawford and CCC.  The SEC may submit a supplemental memorandum addressing solely these questions on or before January 6, 2016, with responses due January 20, 2016.

whether payment of interest should be ordered, and to decide upon both the interest rate and the period of time on which the interest will be calculated." *SEC v. Teo*, 746 F.3d 90, 109 (3d Cir. 2014) (citing *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir.1996)).  In deciding whether an award of prejudgment interest is warranted, a court should consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *First Jersey*, 101 F.3d at 1476 (citing *Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 833-34 (2d Cir. 1992)); *see also Kenton*, 69 F. Supp. 2d at 16.  There is precedent for ordering interest at the IRS underpayment rate through the entry of judgment when the defendant has had control over the unlawful gains for the entire period.  *Teo*, 746 F.3d at 109; *First Jersey*, 101 F.3d at 1477; *Kenton*, 69 F. Supp. 2d at 16-17.

Crawford does not specifically challenge the request for prejudgment interest, but insists generally that all of the SEC's claims for relief were time-barred under Section 2462.  As explained above, the Court concludes that the SEC's requests for equitable relief do not fall within Section 2462's limitations.  Nor was any "delay" by the SEC in bringing suit so great as to raise fairness concerns with regard to the time period on which the SEC asks the Court to calculate interest.  Had the SEC filed its suit merely a month earlier, it would have been within five years of the last date of Crawford's violations (November 2006).  Therefore, any alleged delay on the SEC's part has not unduly extended the length of time for which the SEC seeks prejudgment interest.  *See First Jersey*, 101 F.3d at 1476.  Moreover, Crawford and CCC do not argue that they did not have control of the $240,000 of fees during the entire period, nor do they offer any other reason why the requested award might be unfair.  For these reasons, an award of

prejudgment interest on the Bixby fees that Crawford and CCC must disgorge is reasonable and warranted to prevent them from profiting from their Section 15(a) violations.

### B.    Collyard Group Motion

Before the Court is the SEC's second motion for summary judgment against Collyard Group.  The Amended Complaint alleges that Collyard Group and Collyard, who "owned and controlled" the company, acted as unregistered brokers in connection with the offer and sale of Bixby securities in violation of 15 U.S.C. § 78*o*(a), and knowingly made material misrepresentations and omissions in violation of 15 U.S.C. §§ 77q(a)(2) and 78j(b) and Rule 10b-5(b).  Am. Compl. ¶¶ 12-13, 30-31, 34, 40-54.  Earlier this year, the Court granted summary judgment against Collyard on collateral estoppel grounds in light of his guilty plea in a parallel criminal action, but found that the SEC had not explained how Collyard's guilty plea established that Collyard Group violated the securities laws as alleged.  Dkt. No. 149, at 4.

The SEC's renewed motion adequately supports the conclusion that Collyard's liability for the violations alleged in the Amended Complaint should be imputed to Collyard Group.  A business entity can be held liable for the securities law violations of its agents.  *Cummings v. Paramount Partners, LP*, 715 F. Supp. 2d 880, 906 (D. Minn. 2010) (imposing securities fraud liability on a limited partnership because it "is an inanimate entity that can act only through its agents"); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 381-82 (S.D.N.Y. 2007) (holding at summary judgment that an officer's liability for securities law violations should be imputed to the entity defendants, including a limited liability company); *Vohs v. Miller*, 323 F. Supp. 2d 965, 972 (D. Minn. 2004); *see also Egan v. United States*, 137 F.2d 369, 379-80 (8th Cir. 1943) (upholding jury verdict that a corporation was liable for the criminal acts of its officers "acting, although illegally, within the scope of their employment").

The SEC cites a document in the record, signed by Collyard, showing that he was the "sole member/sole manager" of Collyard Group, was its registered agent, and was "the manager or other person exercising the principal functions of the chief manager" of Collyard Group. SEC-CG Br. Ex. 7.  In addition, by failing to respond in a timely manner to requests for admission properly served by the SEC on Collyard Group's attorney of record, Collyard Group conclusively admitted that Collyard was the sole owner, officer, and employee of Collyard Group; that he "made all decisions concerning Collyard Group;" that he "maintained total control of Collyard Group;" and that he was the sole recipient of any of its profits.  SEC-CG Br. Ex. 5 ¶¶ 1-2, 4, 6-8; *id.* Ex. 6; *Luick v. Graybar Elec. Co.*, 473 F.2d 1360, 1362 (8th Cir. 1973) ("Unanswered requests for admissions render the matter requested conclusively established for the purpose of that suit.").

Given the near-inseparability of Collyard and Collyard Group as established by undisputed evidence and admissions, the Court concludes that Collyard's liability for the securities law violations alleged in the Amended Complaint should be imputed to Collyard Group to the extent that he was acting on its behalf.  To that end, the SEC notes Collyard Group's admissions that "[w]hile Collyard was engaging in the malfeasance set forth in his plea agreement," upon which this Court relied in holding Collyard liable in this action, "he was doing so in his capacity as a principal of Collyard Group," and he "used Collyard Group as an instrumentality in furtherance of the malfeasance set forth in his plea agreement . . . ."  SEC Ex. 5 ¶¶ 26-27.  The SEC also cites evidence showing that Collyard, through a Collyard Group email address, pursued compensation from Bixby in connection with "the funding raised to date," and that Bixby paid Collyard Group $415,654 in "[n]onemployee compensation" in 2006.  SEC-CG Br. Exs. 9-10.  Because Collyard Group does not oppose the SEC's motion, this evidence is

undisputed.  It is also undisputed that Collyard Group has never been registered as a broker or associated with a registered broker.  For these reasons, the Court determines that the SEC is entitled to judgment as a matter of law against Collyard Group on Counts I, II, and III of the Amended Complaint.  *See Soliman v. Johanns*, 412 F.3d 920, 922-23 (8th Cir. 2005) (determining that entry of summary judgment was proper despite a party's failure to respond to the motion).

The SEC seeks a permanent injunction against Collyard Group.  The SEC must show "that the defendant violated the law and that there is a reasonable likelihood of future violations." *Gruenberg*, 989 F.2d at 978.  Here, the SEC fails to support the second point.  The documents it submitted show that Collyard Group has been administratively terminated and that its sole owner and officer was sentenced in 2013 to serve ten years in prison.  SEC-CG Br. Exs. 3, 5 ¶ 24, 7. Moreover, this Court has already permanently enjoined Collyard from future violations of the relevant securities laws, Dkt. No. 149, at 5-6, and the SEC has taken the position that Collyard Group has no other officers, members, or employees.  Therefore, the SEC's request for a permanent injunction against Collyard Group is denied.

C.    **Weides Motion**

On April 7, 2015, in accordance with defendant Christopher C. Weides' ("Weides") consent agreement with the SEC ("Consent"), the Court entered judgment against Weides and permanently enjoined him from future violations of Section 15(a).  Dkt. No. 150.  Consistent with the Consent, the Court ordered that Weides was "liable for disgorgement of $177,000, representing profits gained as a result of the conduct alleged in the complaint, plus prejudgment interest of $71,752," but determined that it would "set the specific amounts of disgorgement and prejudgment interest to be paid, if any and . . . also determine whether to impose civil penalties

. . . and in what amounts, at a separate hearing upon due notice and motion by the SEC." *Id.*

Weides would be able to present evidence at the hearing, and the SEC would be able to conduct

further discovery "for the purposes of determining the amount of ill-gotten gains and civil

penalties, if any." *Id.*

In the Consent, Weides agreed that "solely for the purposes of such motion" to determine

the amounts of disgorgement, prejudgment interest, and civil penalty, if any, "the allegations of

the complaint shall be accepted and deemed true by the Court." *Id.* Ex. A ¶ 4.

The SEC's current motion seeks an award of $177,000 in disgorgement, prejudgment

interest of $71,752.17, and an appropriate civil penalty.  SEC-CW Br. 6.

Consistent with the Consent, the Court deems all of the following allegations to be true.

In the Amended Complaint, the SEC alleged that Weides violated Section 15(a) by acting as an

unregistered broker in selling over $1.9 million in Bixby securities from 2003 to 2006 and

receiving at least $177,000 in cash commissions as compensation.  Am. Compl. ¶¶ 4, 6, 38, 46.

Weides had previously been associated with registered broker-dealers, but was not during the

relevant period.  *Id.* ¶ 20.  By acting as an unregistered broker, Weides deprived investors who

purchased Bixby shares through him of the protections afforded by the registration and

regulation of brokers under the federal securities laws.  *Id.* ¶ 4.  In or around 2010, "Weides also

acted as an intermediary in the sale of Bixby securities in several secondary market transactions"

by "contact[ing] several Bixby investors to solicit their interest in selling their Bixby shares and

coordinat[ing] the transfer of ownership of Bixby securities to new purchasers."  *Id.* ¶ 39.  The

SEC does not specifically allege that Weides was compensated for his actions in 2010 or that he

caused losses to any of the new purchasers or sellers.

The Court finds that disgorgement and an award of prejudgment interest are appropriate in order to prevent Weides from profiting from his ill-gotten gains. *SEC v. Brown*, 658 F.3d 858, 860-61 (8th Cir. 2011); *SEC v. O'Hagan*, 901 F. Supp. 1461, 1472-73 (D. Minn. 1995). For purposes of this motion only, the Court accepts that Weides received at least $177,000 as compensation for his violations of the securities laws from 2003 to 2006. Pursuant to this Court's April 7, 2015 Order, he is also liable for $71,752.17 in prejudgment interest. Dkt. No. 150. Weides does not oppose the SEC's motion for monetary relief.[5] Accordingly, the Court finds that disgorgement in the amount of $177,000, with prejudgment interest in the amount of $71,752.17, is merited.

The Court declines, however, to order Weides to pay a civil penalty. As explained above, the Court cannot grant civil penalties based on defendants' actions more than five years before the SEC filed the complaint. 28 U.S.C. § 2462; *Gabelli v. SEC*, 133 S. Ct. 1216, 1220, 1224 (2013). Although the SEC argues that "Weides profited significantly from acting as an unregistered broker-dealer," SEC-CW Br. 5, the only profits it cites relate to Weides' activities wholly or predominantly during a time period beyond the statute of limitations. The Court accepts that Weides' Section 15(a) violations from 2003 to 2006 caused investors to pay over $1.9 million for Bixby securities, and that Weides earned at least $177,000 in cash commissions from these sales. Am. Compl. ¶ 38. But the Court will not award a civil penalty based on Weides' actions before December 2006, and the SEC has not specified what losses or ill-gotten gains, if any, stem specifically from Weides' conduct during December of 2006, the only time

---

[5] After the SEC filed the Weides Motion, Weides' counsel moved to withdraw from the representation, and her motion was granted, over Weides' objection, upon a finding that "[t]here is no evidence to suggest that Weides cannot competently represent himself" at the hearing on the Weides Motion, "[n]or was there any evidence submitted to convince [the presiding magistrate judge] that allowing withdrawal would significantly delay the resolution of this case." Oct. 27, 2015 Order, at 3, Dkt. No. 182. Weides did not subsequently file any documents *pro se.*

period within the statute of limitations.  *See Riordan*, 627 F.3d at 1234 (noting that the SEC's request for civil penalties "pose[d] no statute of limitations problem" because it was based solely on defendant's activities during the time period falling within the statute of limitations).  No gains or losses specifically connected to Weides' actions in 2010 have been brought to the Court's attention.  On the record before it, the Court denies the SEC's request to impose civil penalties on Weides.

## III.   Order

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.  The SEC's motion for summary judgment against Paul D. Crawford and Crawford Capital Corp. [Dkt. No. 163] is GRANTED IN PART and DENIED IN PART.  Entry of summary judgment against Paul D. Crawford and Crawford Capital Corp. on Count I of the Amended Complaint is ORDERED.  The Court further GRANTS the SEC's request for injunctive relief, but DENIES its request for civil penalties.

2.  Defendants Paul D. Crawford and Crawford Capital Corp., and each of them, and all officers, agents, servants, employees, attorneys, and persons in active concert or participation with either or both of them who receive actual notice of this Order by personal service or otherwise are permanently restrained and enjoined from violating Section 15(a) of the Securities Exchange Act of 1934 by making use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) without being registered in accordance with Section 15(b) of the Exchange Act.

3.  The SEC's renewed motion for summary judgment against Collyard Group, LLC [Dkt. No. 157] is GRANTED IN PART and DENIED IN PART.  Entry of summary judgment is ORDERED.  The Court DENIES the SEC's request for a permanent injunction.

4.  The SEC's motion for monetary relief against Christopher C. Weides [Dkt. No. 151] is GRANTED IN PART and DENIED IN PART.  The Court GRANTS the SEC's requests for disgorgement and prejudgment interest, but DENIES its request for civil penalties.

5.  Defendant Christopher C. Weides is liable for disgorgement of $177,000, together with prejudgment interest in the amount of $71,752.17.  Payments of such judgment shall be made to the Clerk of this Court.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: December 9, 2015

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge